OSCN Found Document:LOPEZ v. STATE

 

 
 LOPEZ v. STATE
2025 OK CR 15
Case Number: F-2023-401
Decided: 09/25/2025
Mandate Issued: 09/25/2025
THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA
Cite as: 2025 OK CR 15, __ P.3d __

 

JONATHAN PORTILLO LOPEZ, Appellant, v. STATE OF OKLAHOMA, Appellee.

O P I N I O N

HUDSON, JUDGE:

¶1 Appellant, Jonathan Portillo Lopez, was tried and convicted by a jury in the District Court of Oklahoma County, Case No. CF-2021-919, of Murder in the First Degree, in violation of 21 O.S.Supp.2012, § 701.721 O.S.Supp.2015, § 13.1

¶2 Lopez now appeals and raises the following propositions of error: (1) the trial court wrongly denied Appellant his constitutional right to testify when it terminated his testimony; (2) trial counsel was constitutionally ineffective; (3) the trial court erred in failing to instruct on the defense of another; (4) the trial court erred in failing to instruct on the lesser included offense of heat of passion manslaughter; (5) the trial court erred in restricting defense counsel from correcting a misleading statement regarding Appellant's criminal history; and (6) cumulative error.

¶3 After thorough consideration of the entire record before us on appeal, including the original record, transcripts, exhibits and the parties' briefs, we find that Proposition One has merit, which for reasons set forth below mandates that Lopez's conviction be REVERSED and the case REMANDED FOR NEW TRIAL.

¶4 This case involves the shooting death of Jordan Ortega. In the early morning hours of February 20, 2021, Appellant shot and killed Ortega in the Oklahoma City home where he was staying. The victim had moved to Oklahoma City from Texas earlier that month and was staying with Appellant's brother, Milton Lopez, and Milton's girlfriend, Cassandra Moises. Milton, Appellant, and Ortega were childhood friends.

¶5 Appellant shot Ortega four times with a semi-automatic SKS 7.62 x 39 mm rifle. The evidence at trial, however, showed that a total six shots were fired that morning. Ortega was shot once in his right ear, from a distance of "probably 18 to 24 inches," once in the right side of his neck at close range, and twice in the left side of his neck at close range. The victim was standing when the first bullet struck him and supine when the other three bullets struck him.

¶6 Following the shooting, Moises called 911 at 5:24 a.m. and told the dispatcher that her "roommate woke up crazy trying to . . . kill [her] with a knife and gun." Oklahoma City Police officers arrived at the scene shortly thereafter. Appellant admitted upfront to police at the scene that he shot the victim and claimed he did so to protect himself and the others in the house. Officers who interacted with Appellant at the scene testified he looked "shaken up" and "in shock." The subsequent investigation of the killing done by police, however, uncovered significant evidence contradicting Appellant's claim of self-defense and indicating Appellant shot Ortega with malice aforethought.

¶7 In his first proposition, Appellant complains the trial court improperly denied him his constitutional right to testify when it terminated his testimony shortly after he took the stand to testify on his own behalf. Appellant's violation of an in limine evidentiary ruling impelled the trial court's punitive action. To address Appellant's claim, some background information regarding the nature of the trial court's in limine ruling and Appellant's perceived willful violation of that ruling is needed.

PROCEDURAL BACKGROUND

¶8 Motion in Limine. Prior to trial on February 17, 2023, the State filed a Motion in Limine to Exclude Evidence of the Victim's Criminal History. The State asserted therein that there was no evidence Appellant was aware of the victim's criminal history or that it factored into his decision to shoot the victim. Without such evidence, the State argued "admission of evidence regarding the Victim's criminal background and incarceration [should be] barred from admission[.]"

¶9 The trial court held a hearing on the State's motion at the end of the first day of trial, following voir dire and prior to the presentation of evidence. During the hearing, the prosecutor acknowledged that the victim had committed "several quite violent offenses" but argued there was no evidence Appellant had knowledge of the victim's criminal history. The prosecutor argued that without evidence that Appellant knew about the victim's crimes and that such knowledge contributed to his purported "fear of great bodily injury or death," the challenged evidence "would just serve the singular purpose of prejudicing the jury against [the victim]." Defense counsel stated that she did not anticipate Appellant "saying anything other than he knew [the victim] was in prison," and agreed that any knowledge regarding the victim's criminal history by anyone else in the house was not relevant.

¶10 The trial court ruled that "unless and until" Appellant took the stand" and said he knew about the victim's history, i.e., "it scared the crap out of me, that's why I did A, B, and C[,]" she would not consider "opening the door" to the challenged evidence. When the trial court asked if everyone understood, the following exchange occurred:

STATE: . . . how do we establish his knowledge and dependence on that knowledge without first bringing that in front of the jury?

COURT: Okay.

STATE: Do you see what I'm saying?

COURT: No, what I'm saying is nobody mentions it unless and until [Appellant] takes the stand and then he talks about it.

STATE: Well, I appreciate that, Judge. But I feel like we have to meet those elements first otherwise he could just get on the stand and say it.

COURT: Yeah, he can.

STATE: But then if he doesn't meet - - if he doesn't meet the standard then that's been prejudice - - like, it's already - - Pandora's box has been opened.

COURT: Well, no. Because, before [defense counsel] goes there, she's going to approach and say, Judge, I'm fixing [to] go down this line of questioning. And you can raise an objection at that time.

STATE: Okay.

COURT: Are you with me on that?

DEFENSE: Yes, Judge.

¶11 Termination of Appellant's Testimony. Appellant took the stand on the fifth and final day of trial. 

¶12 Prior to the termination, Appellant testified about his friendship with the victim since they were teenagers and recalled how everyone "welcomed [the victim] with open arms" when he moved to Oklahoma City. Appellant even offered to teach the victim how to cut hair so the two could work together in a barber shop. While Appellant did not live with his brother, he explained that he occasionally stayed at his house.

¶13 According to Appellant, prior to the early morning hours on February 20, 2021, when the shooting took place, the victim had never threatened him. As to the events leading up to the shooting, Appellant testified that he and his friend, Jeremy Esgar, snorted heroin around noon on February 19, 2021. Later that night at 10 or 11 p.m., the two went to Milton's house. The victim was asleep on the couch when they arrived, and Milton was in his room. Moises was in the "kitchen/dining room area." Appellant and Esgar joined her in there, and the three sat around the dining room table "just chilling" and "listen[ing] to music." At some point, the victim woke up, walked past Appellant without saying anything, and went straight to the kitchen. The victim seemed agitated. Once in the kitchen, the victim went to the kitchen sink and grabbed a knife. He then opened the stove and just looked at everyone.

¶14 Appellant found the victim's behavior to be unusual. Appellant explained that the victim was not acting like himself and appeared to be mad. When the victim broke his silence, he "started threatening everybody" and grabbed Appellant's cellphone. Appellant was a "little bit" afraid of the victim at this point and was "trying to talk to him" and "calm him down." Asked why he was a little scared of the victim, Appellant said "I know Jordan. I know him. He's a person I know how he gets." Thereafter, the following exchange occurred:

DEFENSE: You said you know how he is?

APPELLANT: Yes, I know how he can get.

DEFENSE: Okay. Were you concerned that he had a knife in his hand?

APPELLANT: Yes.

DEFENSE: Why?

APPELLANT: Because why would you just have a knife in your hand when you were around people that care about you, you know. I mean just acting angry. Acting mad.

DEFENSE: To your knowledge did [the victim] have a history with having knives in his hand?

APPELLANT: Yes, he'd been to prison before for stabbing somebody.

STATE: Your Honor, this is exactly - - we had motions - -

The following then took place at the bench out of the hearing of the jury:

COURT: Are we done here?

DEFENSE: I was trying to - -

COURT: Counsel, where do we go from here?

DEFENSE: I told him not [to] bring that up.

COURT: Okay. We're past that.

DEFENSE: I understand. I understand. I know he had personal knowledge of that. If I need to I can flesh it out. I'm sure Ms. Behenna's going to ask for a mistrial.

COURT: Or I can just terminate his testimony. Is the State asking for a mistrial?

STATE: Your Honor, at this point - -

COURT: These are your options. You can ask for a mistrial or I'll terminate his testimony.

STATE: I'd rather have his testimony terminated.

¶15 Thereafter, the trial court allowed defense counsel to make a record of her conversations with Appellant before he testified. Defense counsel explained that she had told Appellant that they had to "go step by step and to listen to the questions," but he "just vomit[ed] it out[,]" which "certainly was not [her] intention." Defense counsel also apologized to the court. The trial court did not blame defense counsel but found Appellant's evidentiary overstep was "his doing and his alone" and that he did so deliberately. Defense counsel acknowledged the court could make that assumption but reasserted Appellant's constitutional right to testify and argued he should still be able to do so. The court disagreed and found Appellant had "vitiated" his right to testify "by his testimony." Defense counsel countered arguing that even though Appellant was "warned not to by the Court, he's not a lawyer" and still had a "constitutional right to take the stand." 

ANALYSIS

¶16 Appellant complains on appeal that "[h]is ill-timed statement of the evidence cannot be construed as a 'vitiation,' or waiver, of [his] right [to testify.]" Even if he willfully violated the trial court's in limine order, Appellant contends the sanction imposed was far too severe given the circumstances of his case and resulted in a complete denial of his constitutional right to testify.

¶17 This Court has not addressed in a published opinion whether a defendant, through their misconduct, may forfeit their right to testify, and if so, the circumstances under which the right can be lost. The Court has, however, addressed a similar issue in an unpublished opinion. See Padillow v. State, No. F-2014-22, slip op. at 8-10 (Okl. Cr., June 9, 2015) (not for publication) (finding the defendant, through his violent disruptive behavior in the courtroom, waived his right to testify).

¶18 For the reasons set forth below, we find Appellant's behavior in this case, unlike the violent behavior described in Padillow, was not the type of defiant, disorderly, or disruptive conduct necessary to justify the forfeiture of his right to testify. Further, in light of the circumstances presented in this case, the State cannot establish beyond a reasonable doubt the error in terminating Appellant's testimony was harmless, i.e., it did not affect the trial's outcome. Chapman v. California, 386 U.S. 18, 24 (1967). See also Simpson v. State, 1994 OK CR 40876 P.2d 690Chapman, 386 U.S. at 24)).

1. Right to Testify

¶19 The right to "testify on one's own behalf at a criminal trial" is grounded in three provisions of the Constitution--the Fifth, Sixth and Fourteen Amendments--and "is one of the rights that are essential to due process of law in a fair adversary process." Rock v. Arkansas, 483 U.S. 44, 51 (1987) (internal quotations and citations omitted). First, "the Fifth Amendment's guarantee against compelled testimony . . . is part and parcel of the privilege to testify if one wishes to do so." Id. at 53. Second, the Sixth Amendment's Compulsory Process Clause "grants a defendant the right to call 'witnesses in his favor.'" Id. at 52 (quoting Washington v. Texas, 388 U.S. 14, 17--19 (1967)). In fact, in many criminal cases, "the most important witness for the defense . . . is the defendant himself." Id. And third, the "Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due process of law include[s] a right to be heard and to offer testimony." Id. at 51.

¶20 A defendant's right to testify, however, is not absolute. United States v. Rivas-Macias, 537 F.3d 1271, 1277-78 (10th Cir. 2008). For example, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor v. Illinois, 484 U.S. 400, 410 (1988). Nonetheless, while a defendant's right to testify may be limited by "legitimate interest[s] in the criminal trial process," such limitations "may not be arbitrary or disproportionate to the purposes they are designed to serve." Rock, 483 U.S. at 55-56. See also Phillips v. State, 1999 OK CR 38989 P.2d 1017

¶21 In this case, the issue is not whether the evidentiary limitation placed on Appellant's testimony was reasonable, but rather whether Appellant's violation of the trial court's in limine ruling warranted the penalty imposed by the trial court. It did not.

2. Forfeiture by Conduct

¶22 Just as the Supreme Court in Illinois v. Allen, 397 U.S. 337, 343 (1970) held the constitutional right to be present in court can be lost, several other courts have found the right to testify may also be waived or forfeited by a defendant's serious misconduct during trial. Allen held that "a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court[.]" Allen, 397 U.S. at 343. "[T]he rationale of Allen logically extends to the context of the right to testify, given that a corollary to removal may be denial of that right." State v. Anthony, 2015 WI 20, ¶ 59, 860 N.W.2d 10, 22. We similarly conclude here, as we did in Padillow, supra, at 8-10, that a criminal defendant, through their misconduct, may forfeit his or her right to testify.

¶23 Still, "not every violation of evidentiary rules or the court's instructions . . . justifies depriving a criminal defendant of the right to testify." United States v. Evans, 908 F.3d 346, 355 (8th Cir. 2018). To the contrary, "trial courts must indulge every reasonable presumption against the loss of constitutional rights[.]" Allen, 397 U.S. at 343 (citing Johnson v. Zerbst, 304 U.S. 458, 464 (1938). "[F]orfeiture of the right [to testify] should be limited to only the most defiant of defendants, and then only after the court explains the consequences of continued defiance." Evans, 908 F.3d at 355. See also United States v. Gillenwater, 717 F.3d 1070, 1081 (9th Cir. 2013) ("A defendant's right to testify . . . cannot be lost unless it is clearly necessary to assure the orderly conduct of the trial." (internal quotation marks and citation omitted)).

3. Severity of Appellant's Conduct

¶24 We review the trial court's decision to terminate Appellant's right to testify for an abuse of discretion. See Allen, 397 U.S. at 347. "An abuse of discretion is any unreasonable or arbitrary action taken without proper consideration of the facts and law pertaining to the matter at issue." Neloms v. State, 2012 OK CR 7274 P.3d 161

¶25 This case does not present the type of extreme misconduct by a defendant needed to justify the termination and forfeiture of their constitutional right to testify without any prior warning of the consequences. Compare Padillow, supra, at 10 (finding Padillow waived his right to testify when he "attacked defense counsel after he rose to go to the witness stand"). Appellant's evidentiary infraction in this case, which is analogous to an evidentiary harpoon, certainly was not the type of flagrant and reprehensible conduct that on its own warranted such an extreme sanction. Indeed, despite the trial court's clear outrage caused by Appellant's perceived infraction, the trial court notably never admonished the jury to disregard Appellant's objectionable testimony. Nor does the record on appeal show that Appellant's behavior had been an issue during his trial.

¶26 The trial court's termination of Appellant's testimony and forfeiture of his right to testify was a disproportionate and excessive penalty for his evidentiary infraction. 

¶27 Given the circumstances presented here, Appellant's right to testify in his own defense transcends his innocuous evidentiary infraction. The termination of Appellant's testimony was excessive and unwarranted and unjustly denied Appellant his constitutional right to testify.

4. Constitutional Error Analysis

¶28 We must next determine the ramifications of the trial court's constitutional error. We apply the United States Supreme Court's harmless error doctrine. Barnes v. State, 2017 OK CR 26408 P.3d 209Id. To find the error harmless beyond a reasonable doubt, this Court "must be able to declare a belief" that it played no role in the jury's verdict. Chapman, 386 U.S. at 24.

¶29 Given the circumstances presented in this case, we cannot say with certainty that the denial of Appellant's right to testify did not contribute to his first-degree murder conviction. Appellant was charged with first-degree murder, and in the alternative, manslaughter in the first degree. Appellant contended from the outset that he acted in self-defense, and the trial court gave the jury self-defense instructions. Appellant's claim of self-defense hinged critically on his ability to present his narrative of the events in his own words. Although two eyewitnesses testified for the defense, the abrupt termination of Appellant's testimony precluded him from providing any substantive account of the events in question or to address the State's evidence.

¶30 The relevance of Appellant's testimony is self-evident given the alternative charges filed in this case and his claim of self-defense. Indeed, it is difficult to fathom testimony more logically connected to a claim of self-defense than the defendant's own testimony about the killing. Appellant's testimony was thus of prime importance. See McKaskle v. Wiggins, 465 U.S. 168, 177 (1984) ("[T]he right to speak for oneself entails more than the opportunity to add one's voice to a cacophony of others."); Rock, 483 U.S. at 50 ("[P]ermitting a defendant to testify advances both the 'detection of guilt' and the 'protection of innocence.'"). Moreover, even if the jury rejected the Appellant's claim of self-defense, his testimony may still have been sufficient to cause the jury to convict Appellant of the alternative charge of first-degree manslaughter, instead of first-degree murder.

¶31 While the State's evidence of malice aforethought was substantial, it does not eliminate the possibility that the denial of Appellant's right to testify contributed to Appellant's conviction. The State therefore cannot show beyond a reasonable doubt that the error played no role in the jury's verdict. Relief in this case is thus warranted. Proposition One is granted.

DECISION

¶32 The Judgment and Sentence of the District Court is REVERSED AND REMANDED FOR A NEW TRIAL. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2025), the MANDATE is ORDERED issued upon delivery and filing of this decision.

AN APPEAL FROM 
THE DISTRICT COURT OF OKLAHOMA COUNTY
THE HONORABLE SUSAN STALLINGS, DISTRICT JUDGE

 
 
 APPEARANCES AT TRIAL
 
 JOI MISKEL
 MORGAN SMITHTON
 ATTORNEYS AT LAW
 1901 N. CLASSEN BLVD.
 OKLAHOMA CITY, OK 73106
 COUNSEL FOR DEFENDANT
 APPEARANCES ON APPEAL
 
 CHRISTOPHER J. CAPRARO
 OKLA. INDIGENT DEFENSE SYSTEM
 APPELLATE DIVISION EAST
 111 N. PETERS, STE. 100
 NORMAN, OK 73069
 COUNSEL FOR APPELLANT
  
 
 
 VICKI BEHENNA
 DISTRICT ATTORNEY
 KATIE SAMPLES
 ASST. DISTRICT ATTORNEY
 OKLAHOMA COUNTY
 320 ROBERT S. KERR, STE. 505
 OKLAHOMA CITY, OK 73102
 COUNSEL FOR THE STATE
 GENTNER F. DRUMMOND
 ATTORNEY GENERAL OF
 OKLAHOMA
 KEELEY L. MILLER
 SENIOR ASSISTANT
 ATTORNEY GENERAL
 313 N.E. 21ST STREET
 OKLAHOMA CITY, OK 73105
 COUNSEL FOR APPELLEE
 
 

OPINION BY: HUDSON, J.
LUMPKIN, P.J.: SPECIALLY CONCUR
MUSSEMAN, V.P.J.: CONCUR
LEWIS, J.: CONCUR
ROWLAND, J.: CONCUR

FOOTNOTES

12 O.S.2021, § 2404Davis v. State, 2011 OK CR 29268 P.3d 86

directly warned Appellant not to testify about his knowledge of the victim's criminal history or warned Appellant of the potential consequences of doing so. Rather, the trial court directed defense counsel to forewarn the court before "go[ing] down this line of questioning." In fact, just prior to Appellant taking the witness stand, the trial court advised him that he had "the absolute constitutional right to testify."

See, e.g., United States v. Nunez, 877 F.2d 1475, 1478 (10th Cir. 1989) ("[T]he right to testify is not absolute and may be waived by contumacious conduct." (internal quotation marks and citations omitted)); United States v. Ives, 504 F.2d 935, 941--42 (9th Cir. 1974) (holding that a defendant may lose his right to testify due to disruptive conduct, because "such conduct cannot be allowed when the defendant takes center stage on the witness stand."), vacated on other grounds, 421 U.S. 944, (1975), opinion reinstated in relevant part, 547 F.2d 1100 (9th Cir 1976) (per curiam); People v. Johnson, 6 Cal. 5th 541, 570, 432 P.3d 536, 561 (2018), as modified on denial of reh'g (Mar. 13, 2019) (finding defendant's action, after numerous warnings, "impelled the trial court to conclude that defendant had forfeited his right to testify by his misconduct."); State v. Anthony, 2015 WI 20, ¶ 95, 860 N.W.2d 10, 29 (finding the defendant "forfeited his right to testify by exhibiting stubborn and defiant conduct that posed a serious threat to both the fairness and reliability of the criminal trial process and the preservation of dignity, order, and decorum in the courtroom."); State v. Mosley, 200 S.W.3d 624, 633-634 (Tenn. Crim. App. 2005) (finding defendant's unruly behavior foreclosed the possibility of meaningful cross-examination and warranted striking of his testimony from record); State v. Chapple, 145 Wash.2d 310, 36 P.3d 1025, 1034 (2001) (holding that the defendant "waived both his right to be present at trial and his right to testify by refusing to properly conduct himself during trial."); State v. Irvin, 628 S.W.2d 957, 960 (Mo. Ct. App. 1982) (stating that "[a] defendant has no more right to take the stand and 'testify in a way degrading to the judicial system than he has to rob a bank or to assault a constable.'" (quoting Ives, 504 F.2d at 941)).

 

 

LUMPKIN, PRESIDING JUDGE: SPECIALLY CONCURRING

¶1 While I concur in the resolution of this case, I write separately to address more fully the trial court's troubling limitation of Appellant's testimony regarding his claim of self-defense. Specifically, testimony of his knowledge of the victim's violent nature. Such evidence is expressly allowed by statute, specifically, 12 O.S.2021, § 2404Davis v. State, 2011 OK CR 29268 P.3d 86

In a homicide case where the defense is that of self-defense, acts of violence by the victim antecedent to the homicide may be introduced where the defendant was aware of the specific prior acts of violence and that awareness or knowledge helped form the basis for his purported fear of the victim resulting in the alleged act of self-defense against the victim, and tending to establish the victim as the aggressor.

¶2 The reasonableness of a defendant's actions will greatly depend on his/her perception and knowledge of his/her attacker. The ability to relate that to a jury should not be diluted if within evidentiary bounds. A defendant's personal knowledge of his/her attacker's background is vital to presentation of the self-defense claim and is something generally only the defendant can testify about. Trial judges need to be cognizant of these aspects of a self-defense claim and utilize them in analyzing evidence presented in support of such a claim.

¶3 The Court addresses the proposition of error as presented by Appellant, i.e., the sanction was too harsh, and properly adjudicates it. Although not presented as part of Appellant's proposition of error, the fundamental principles of law need to be recognized. Because the Court's opinion thoroughly and correctly addresses each of the propositions of error as presented, I concur in its analysis.